Good morning, Your Honors. Robin Meadow, representing IMPEX. I'd like to focus on two clauses out of the Interparty Agreement. The first is part of paragraph 9, and we've argued that paragraph 9 has multiple clauses that require payment of the assigned receipts within 10 days, promptly upon delivery of the film, unconditionally. But I'd like to focus specifically on the arbitration clause, which is part of paragraph 9. Even more than the payment clauses, this directs payment in a way that cannot be reconciled with the requirement that the parties await the release of the film. If there's a dispute about whether delivery has occurred, the parties are entitled to invoke arbitration. And the clause starts at page 475. What the agreement provides for is what I can only describe as a warp speed arbitration. From the notice of arbitration to the issuance of the award is required to occur in 14 business days. The arbitrator must declare whether delivery has been effected, and if he finds that delivery has been effected, he must order Sony to make the payment within five days after the award. There is no way to graft onto this provision any requirement that the parties must await the theatrical release. Except for paragraph 3.1.1. Let me turn to that. Paragraph 3.1. Well, first of all, the language doesn't permit you to graft the requirement onto it. It does cross-reference all of the paragraph 9 sections, cross-reference paragraph 3. But all of them have specific deadlines. And this one in particular, in the arbitration clause, has a deadline that you can't wait. And I think it's important to recognize what this arbitration clause does. The parties have to go through this process. Essentially, and anyone who's been through a high-speed arbitration knows what this means, you're working around the clock, seven days a week, for several weeks in order to get that award out. And then apparently the drafters of this agreement were asked to believe, said, okay, now that you've done all of that and done everything you could within just a couple of weeks to get the award out the door and the award says the money must be paid in five days, you still have to wait for the release of the movie. I don't think 3.1.1 does that, and there are two distinct reasons. First, 3.1.1 is a global clause. It applies to all three parties, IMPECS, the lender, and the guarantor, and the producer. It has what I would call a waterfall provision. When the payment is made, it goes first to IMPECS, then it goes to the guarantor, and then if there's anything left over, it goes to the producer. So it needs to cover all of them. Now, 3.1.1 speaks of payment, 3.1 says Sony is to make the payment, and then it says the money is payable and not later than, and it defines those two conditions, the delivery of the film and the theatrical release. Payable, not later than. The use of the term payable is distinct in this usage in the contract. It doesn't appear in this usage anywhere else. And what I think that means is that these conditions and payable no later than refers to an outside payment date that covers those three entities. Certainly two of those entities, the guarantor and the borrower, are not entitled to payment any time before the theatrical release. But payable no later than does not preclude an earlier payment to IMPECS. And the significance of that is that all of paragraph 9 unequivocally, as clearly as the English language can make it, does require prompt payment to IMPECS unconditionally upon the delivery of the movie. There is a flexibility in paragraph 3.1.1 that doesn't require that, I'm sorry, that permits that payment with respect to IMPECS, even though the other two entities can't take advantage of it. Now, I know what you'll hear. I'm sorry. I'm looking at 3.1.1. And what is it in the language of that provision that allows us to distinguish between when the timing of the payment should be different depending on who it's being made to? There are two parts of it. First, there is the overall aspect of paragraph 3, the waterfall provision. Unlike paragraph 9, which applies only to IMPECS, in some respects the guarantor plays a role, but it's mainly about payment to IMPECS. This covers all three because it has the waterfall provision. It says that Sony shall pay, and then it describes the numbers, and then it says $855,000, this is in the second line, is payable no later than 10 business days after the first date, et cetera. So it is payable no later than. That is an outside date. It does not say, upon the occurrence of these, Sony shall pay, which is the language of paragraph 9. It says it shall be payable. And it's true that those are conditions with respect to the guarantor and the producer, but this language, I believe, is flexible enough, just flexible enough, to allow it to be harmonized with paragraph 9 because this permits, payable no later than, contemplates that there can be an earlier payment. I mean, why isn't the simpler way to harmonize them, to say that the cross-reference to 3, paragraph 9.2's cross-reference to paragraph 3, means that you have to make the payment when it's due under paragraph 3, and if it's not due under paragraph 3, then paragraph 9 doesn't require them to make it. Because it doesn't work, Your Honor. Paragraph 9 says, payment within 10 days from delivery. Even if it's pursuant to paragraph 3, I think I should add, and I don't think there's any dispute about this, it's very clear that no one expected theatrical release to be happening any time near the delivery of the film. It was months down the road. Could be years down the road. The outside dates for both are over a year apart. So it certainly doesn't work, under any of the literal language of paragraph 9. But again, I have to come back to the arbitration clause. The arbitration clause and its high-speed arbitration, and the requirement of a payment within 5 days after the conclusion of the arbitration, cannot be harmonized, because that timing, there's no way to say, all right, you've all spent the last 3 weeks making this arbitration happen, and you have to pay within 5 days, but now we're going to wait a year, perhaps, to find out if the film is released. Oh, and by the way, notwithstanding the arbitrator's order, that you must pay within 5 days, if the movie isn't released in a way that satisfies us, then we don't have to pay you at all. Those two cannot coexist, Your Honor. You didn't think very much of this argument when you filed your complaint, did you? I mean, the complaint seems to offer a view of how this all works that's pretty different from what you're saying now. Well, the complaint had the concept, and our trial papers had the concept, that the 3.1.1 wasn't a matter of obligation, it was a matter of timing. It really doesn't work, and I think what's significant about it is Judge Otero recognized that it didn't work. He recognized that the core argument on our side really was payment on delivery, nothing more or less. The way he put it in his order was this. This is at page 11 of the excerpts. He wrote, before turning to the two primary disputes, and the principal dispute on summary judgment was the interpretation of the theatrical release clause, no question about that, but before turning to the two primary disputes, the court must first address the contention by plaintiff that the theatrical release is irrelevant and that the delivery payments are due simply because delivery has occurred. He understood that that was and had to be our core contention, and we began our argument at the district court with paragraph 1.1 that says that the payment obligation is conditioned only on the timely delivery of the film. This represents, obviously, a different view of the case, and I know that counsel is going to say that we took a different position in the court, just as Your Honor has. I would say that it's more of a difference in emphasis than a difference in substance, and maybe the most important aspect of paragraph 9 is what Sony has not said about it. We argued in depth, we spent a lot of our opening brief talking about paragraph 9 and why its clauses mandate payment upon delivery. There is no answer to that in the answering brief. One sentence which says what Your Honor says, it cross-references paragraph 3. That's the end of it. No comment about the arbitration. But why isn't that enough? I mean, you seem to be placing very little emphasis on paragraph 3, which clearly discusses payments, and you're saying, no, the meat of everything is contained in paragraph 9, which is a separate issue, arbitration. I mean, you're right, there's some tension between the two, but it seems to me that the natural inclination is to go back to where payment is defined and the payment is laid out. Your payable argument is an interesting one, but it still seems to kind of just read out this whole theatrical release provision, and it doesn't make sense why they would have put that in there. You're saying that that was just a date for a backdrop, but it seems to clearly be contemplated as that's when the payment, that has to happen before the payment's due. Well, Your Honor, I think there's no question, but if the parties had to do it over again, this agreement would be drafted better. But paragraph 9 is unequivocal. It's not just about the arbitration clause. Multiple places in paragraph 9. And paragraph 9 comprises almost a third of this entire agreement. It goes on for seven of the 22 pages. And in multiple places it says payment within 10 days of delivery. And, yes, it says in accordance with paragraph 3. It doesn't say 3.1.1. And paragraph 3 also has language that says here's how you make the payment. Here's the account to wire the funds to. It just says in accordance with paragraph 3. So it says you must pay. One of these paragraphs has to yield, and there is nothing in paragraph 9 that can yield on the basis of just plain English language reading of it. Paragraph 3 can yield because it serves a different purpose. If all we had was paragraph 3, Sony would have the better of the case. There's no question about it. But we have more than paragraph 3. Well, but I guess that's sort of the problem I have is that paragraph 9 says the precatory statement is whether mandatory delivery or complete delivery has been effected shall be determined in accordance with the procedures specified in this paragraph. So that seems to be addressing when mandatory delivery happens. It doesn't talk about theatrical release at all. And then when you get into paragraph 3,  I just feel like you're reading paragraph 3 out of it. And I understand your argument. All right. I'd like to reserve some time, but I would ask Your Honor to read through paragraph 9 in detail. It's much more. Paragraph 8 is how to make delivery. Paragraph 9 says what happens when you do it. What happens when you do it is you have to pay. Thank you. I'd like to reserve my time. Thank you. Good morning, Your Honors. May it please the Court. Mark Long from the Law Firm of Loeb & Loeb representing Sony Pictures Worldwide Acquisitions. I think it would help to start by discussing what the purpose of the qualifying U.S. theatrical release under the IPA was intended to be. Under the deal structure, Sony acquired the foreign distribution rights to the film. And the value of foreign distribution rights in a film like this, which is relatively small, increases greatly when you generate buzz and critical acclaim in the U.S. market, which, of course, is the lead film market throughout the world. So for that reason, the U.S. theatrical release was critical to Sony for this film, that it be released in a fixed number of theaters in the biggest U.S. markets, and that's why payment was only required to be made after the qualifying U.S. theatrical release occurred. Now, that was everyone's understanding until this appeal, and now IMPEX argues for the first time that the very opposite is true. And Mr. Meadows just said it, that the payment had to be made. While it may have been payable later, it had to be paid before a qualifying U.S. theatrical release occurred. Counsel, it's not really the first time they've argued that. I mean, the district court seems to have understood them to have made the argument, and it addressed that argument in its order, didn't it? The argument they raised was that this wasn't legally a conditioned precedent but rather an issue of timing. Now, under California law, under the Civil Code provisions and applicable case law, they're one and the same. If an obligation is due to occur after something else occurs before, that, by definition, is a conditioned precedent. So that legal argument was faulty, but the underlying premise of that argument that IMPEX raised below was still that the qualifying theatrical release had to occur before the payment was made, whether you classified that as a conditioned precedent or as an issue of timing. So the issue on this appeal is distinctly different. It is a binary issue. Under this contract, under the parole evidence, under the judicial admissions, is the payment due before or after the qualifying U.S. theatrical release? Now, with respect to that question— Just so I'm understanding their argument, and I guess I should ask, the language in 3.1.1 says that money is payable no later than 10 business days after both of these conditions are met. If there's no theatrical release, wouldn't it follow that the payment's not payable? Well, I don't want to do Mr. Meadows' job for him, but my understanding is certainly that's our position, that it's not payable if there's no qualifying U.S. theatrical release. And Judge Nelson, like you pointed out, if Mr. Meadows' interpretation, if IMPEX's interpretation is correct, then this provision literally has no meaning. It becomes completely superfluous and written out of the contract, and it was heavily negotiated. And as you also pointed out, this provision, Section 3.1, is the section governing distributor payments, and that's the basis of this claim, not Section 9 dealing with arbitration. And notably, we're not in arbitration. But what about—so then what does 9.2 mean? Or are you just agreeing there's an inconsistency here? Because it does say that SPWA shall pay the mandatory delivery payment to the lender as provided in paragraph 3, no later than 10 business days after the date of delivery. And that doesn't mention the theatrical release. Your Honor, I would say the same thing you said to IMPEX's counsel, that it says as provided in accordance with paragraph 3, which incorporates, of course, Section 3.1.1. The case of Parsons v. Bristol from the California Supreme Court is squarely on point on this issue, where in a materially identical circumstance, the California Supreme Court held that even though a condition wasn't expressly stated in the provision of the contract that was allegedly breached, that provision, the allegedly breached provision, makes explicit reference to payment under preceding subdivisions by language such as under the preceding terms and partial payment. So your argument basically is as provided under paragraph 3 above, which is contained in 9.2, that's what you're resting your argument on, how 3 is basically incorporated. The theatrical release is effectively incorporated into 9.2. Your Honor, that's one of our many arguments, but certainly that is an argument with respect to the language. What if that language weren't there as provided in paragraph 3 above, or we found that that wasn't specific enough? Would you agree at that point that there's just a conflict between the statement and the obligation in 9.2 and in 3.1.1? Yes, Your Honor. We would certainly agree if that provision were not there, there would be a greater tension between the two provisions, but we still think that we would prevail for the various other reasons we've identified in the brief. Again, to state what Your Honor said earlier, the qualifying U.S. theatrical release would be rendered meaningless if the contrary argument prevailed. There are various canons of contract interpretation that give precedence and priority to Section 3.1 over this provision of Section 9, including that specific prevails over the general. The fact that Section 3 specifically deals, expressly deals with the distributor payments, gives that provision priority over the issues in this action, which is the distributor payments. The headings, of course, reflect this. There's case law that supports the view that headings are indicative of what the party's intent is. So even to the extent there was a contradiction between the two provisions, we still think Section 3.1.1 should prevail. And finally, Your Honor, perhaps most tellingly, is all of the parole evidence and the judicial admissions that answer this question, this binary question about whether the qualifying theatrical release had to occur before or after, or whether payment had to occur before or after the qualifying theatrical release. This question was answered repeatedly before this litigation, in the complaint, through the litigation, including IMPACTS' 30B6 deposition witness, as well as in their local Rule 56.2 statements of undisputed, uncontroverted facts. And I'll just quote some of these for you. This is a November 2, 2016, letter. I'm looking at ER 242, a letter sent by IMPACTS' counsel prior to this litigation having been commenced. Stating, Section 3.1.1 of the IPA requires SONY to pay the mandatory delivery payment no later than 10 business days after the first date that both mandatory delivery occurs and the date of the qualifying U.S. theatrical release. Delivery was effected during 2015. The theatrical release occurred on September 16, 2016. Therefore, the deadline for payment was September 30, 2016, two weeks later after the qualifying theatrical release for 10 business days afterwards. They said the same thing in their 30B6 deposition, which of course is binding upon IMPACTS. Oh, yes. The mandatory delivery payment is due when the movie is delivered and then when it shows on a minimum of 100 screens in the top 10 markets in the United States. Question. So until the movie is shown on a minimum of 100 screens in the top 10 markets, delivery payment is not due, correct? Answer. Correct. The complaint, paragraph 10. Mandatory delivery was effected during 2015 and the qualifying U.S. theatrical release occurred on September 16, 2016. Therefore, the deadline for payment of the mandatory delivery payment was September 30, 2016, all after 10 business days after the qualifying theatrical release occurred. So there was no dispute in the lower court proceeding as to that binary question. There was a legal argument that technically that wasn't a condition precedent, but that argument was wrong as a matter of law. And that goes to the other point, Your Honor, that by having made these admissions, this is all parole evidence, post-execution conduct in the performance of a contract, of course is indicative of the party's intent, as are their statements of what they understood the contract to mean. Sorry to interrupt, but can I ask a question on 3.1.1? I'm just thinking through this. Payable. Is that unambiguous, the use of the word payable? Does it mean their timing, as I guess your opponent is arguing, or does it mean payable, meaning whether you have to pay or not? I don't know if you've given some thought to that or not. The way I understood Mr. Meadows' argument is that the fact that it's payable 10 days after the conditions have been met means that that's an outside date and that, in fact, it's not due 10 days after the date that both conditions are met, but, in fact, in 2015, over a year before when the delivery occurred. I don't see how you square this language with the theory that IMPEX is asserting now. I'll also raise that that theory has never been raised in the briefing in this case. It's an argument raised for the first time at oral argument, and for that reason we would say it's been waived as well. The judicial admissions and the two procedural arguments that also flow from all the judicial admissions that were raised in the lower court, or that IMPEX made in the lower court, as well as the fact that it never raised this novel theory of the contract below. And there are two related theories that we're asserting. One is that they're bound by the judicial admissions. Those have to mean something, especially in the complaint. The complaint is the guiding document throughout the course of a litigation that defines the scope of discovery, that advises the defendant as to what the allegations are, what theories and facts to pursue during depositions and during discovery. Discovery has been closed. The summary judgment record is closed, and now they can't go back after having led us to believe that this was their theory and change it now for the first time on appeal. The other argument, even had they never made these judicial admissions, is that this new theory of contract interpretation can't be asserted for the first time on appeal either. That's just an issue of straightforward waiver. And Judge Nelson, I think you raised this point in a couple of arguments ago with respect to a party who had possibly failed to seek leave to amend, and you asked the question of whether that had been waived. Well, that's exactly what's happened here. They never raised this theory before, and it's been waived. And the broad premise behind both of those procedural theories is that you can't litigate a case in the district court, take a position, lose on that position, go to appeal, say it's a purely legal issue, I'm free to say whatever I want, and try to hit the reset button. That's the hallmark of judicial inefficiency, and we would say and submit that's not how the system works. Unless there are any other questions, Your Honors. Thank you very much, Counsel. Thank you. Thank you. The question is whether our position deprives Paragraph 3.1.1 of all meaning, and it doesn't because Paragraph 3.1.1, as I've said, is part of a global paragraph that applies to all three. It applies differently to impacts because of Paragraph 9. But I think that goes to the definition in the meaning of payable because you're interpreting payable as only setting the timeline, the outside timeline, and maybe that means it's ambiguous. I haven't thought about this argument before, but the other way to look at that would be payable means you don't have to pay it at all until these two things happen. I appreciate that, and if this were the only clause, we wouldn't have this dispute. But these clauses have to be harmonized, and, again, it's interesting. Once again, the only answer to Paragraph 9 is, well, it cross-references Paragraph 3. But that's not without some compelling. Actually, Your Honor, it is without. Okay. One must read Paragraph 9, all seven pages of it. I urge the Court to do it. You will not find the escape clause that they want you to read into it because you cannot say 10 days but. Ten days is meaningless if it is but we have to wait for the release of the film. And, again, if you look at page 34 of our opening brief, we lay out the timing of some of these things. We make the point there that the theatrical release was not expected for many months down the road, so there's no way to squeeze that theatrical release into the 10 days or into the five days after the arbitrary disorder. I see that my time is up. Thank you, Your Honor. Thank you very much, counsel. Thank you both for your arguments. I don't know if we'll see a Wild Oats 2, but counsel are certainly welcome back in this courtroom for a sequel. And with that, this particular panel actually is adjourned. Thank you. All rise.
judges: Owens, Nelson, Miller